NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

14-P-17                                         Appeals Court


SHOREH KARAA & another[1]  vs.  KUK YIM & others.[2]


No. 14-P-17.

Middlesex.     October 8, 2014. - December 5, 2014.

Present:  Kafker, Trainor, & Milkey, JJ.


Real Property, Lease.  Contract, Performance and breach.
    Landlord and Tenant, Termination of lessee's obligation,
    Rent, Security deposit, Consumer protection.  Damages,
    Mitigation, Attorney's fees.  Consumer Protection Act,
    Landlord and tenant, Trade or commerce.



    Civil action commenced in the Superior Court Department on
September 30, 2011.

    The case was heard by Kathe M. Tuttman, J.


    Edward A. Broderick for the plaintiffs.
    Wei Jia, for the defendants, submitted a brief.


    KAFKER, J.  The primary issue presented in this landlord-

tenant case is the proper application of the security deposit

---

    [1] Fadi Karaa.

    [2] China Real Estate Development Investment & Trust Fund
Corporation and Chiung Fong.

provisions in G. L. c. 186, § 15B.  The residential property was owned by Shoreh Karaa and Fadi Karaa (collectively, the Karaas), and rented by China Real Estate Development Investment & Trust Fund Corporation (CREDIT), Kuk Yim, and Chiung Fong (collectively, the tenants).  After a bench trial, the Superior Court judge found that the tenants had breached their lease with the Karaas, and that the tenants' obligations under the lease were not excused under the doctrine of frustration of purpose. The judge also found that the Karaas were not liable for alleged violations of G. L. c. 186, § 15B, stemming from their mishandling of the tenants' security deposit.  The judge further determined that the Karaas had not committed fraud or breached the covenant of quiet enjoyment, that they properly had mitigated their damages, and that they were not liable for alleged violations of G. L. c. 93A.  The trial judge did find, however, that the Karaas were liable under G. L. c. 186, § 15B(2)(a), for their failure to pay interest on the tenants' last month's rent.  On appeal, the tenants take issue with the trial judge's holdings in favor of the Karaas.  We affirm.

Background.  In March, 2010, the Karaas placed their home located at 83 Spring Valley Road in Belmont (property) up for rent at $4,500 per month through listings on the Internet site "Craigslist" and with a real estate agent.  On May 10, 2010, the tenants and the Karaas entered into a written lease agreement

for the property at a reduced rent of $4,300 per month, with a starting date of June 16, 2010. The lease was for one year and fifteen days. The lessees initially listed on the lease were CREDIT and Yim, as the lease was signed by Yim both in her personal capacity and in her capacity as chief financial officer for CREDIT. Subsequently, a new cover page to the lease was substituted, listing Yim and Fong as lessees. This change was made to allow their children to attend school in Belmont.

At the time Yim signed the lease, the tenants gave the Karaas a check for $8,600, which included $4,300 for a security deposit and $4,300 for the last month's rent. Shoreh[3] requested a tax identification or Social Security number so that she could open an escrow account to deposit the funds, and the tenants responded that they would provide the number at a later date. Shoreh deposited the check into her own interest-bearing account the same day the lease was signed. Over the course of the tenancy, the tenants never provided the Karaas a tax identification or Social Security number. Though the Karaas previously had leased other properties and knew that they were required to segregate the security deposit from their personal account and to provide the tenants with a receipt in compliance with G. L. c. 186, § 15B, they did not do so.

---

[3] We use the first names of the Karaas, where applicable, to avoid confusion.

In August of 2010, Fong and Yim, and their children, traveled to China. They intended to return to Belmont later that month, but due to complications with their visas, they were unable to reenter the United States. The tenants paid rent for August, September, and October.[4] On October 26, 2010, Yim sent the Karaas an electronic mail message (e-mail) stating that, because the visa applications for herself and the three children had been rejected, they would not be able to return to the United States, and that the tenants therefore would be terminating the lease. She stated that the Karaas should apply the tenants' earlier check of $8,600 to cover the November rent and as "compensation" for the termination of the lease. Yim further stated that Fong would be returning to the United States around November 15 and would arrange for the move and any necessary paperwork.

In early December, the Karaas posted the house for rent on Craigslist and with a real estate agent. Because of their past experience leasing other properties, the Karaas were aware that it likely would be more difficult to lease the property during the winter months. They eventually relet the house for $4,200 per month beginning April 1, 2011. On September 30, 2011, the Karaas brought a two-count complaint against the tenants for

---

[4] The tenants earlier had paid rent covering June 16 through July 31.

breach of contract and breach of the implied covenant of good faith and fair dealing. Prior to litigation, the Karaas sent the tenants a check, dated September 25, 2011, for $4,604.88 for "security deposit return."[5] The Karaas did not pay the tenants any interest on the last month's rent.

In response, Yim brought counterclaims alleging that the Karaas breached the lease by failing to deliver the entire property, did not comply with the statutory requirements of the security deposit statute and the last month's rent statute, and engaged in unfair and deceptive practices in violation of G. L. c. 93A. Yim additionally claimed that her purpose in entering the lease, i.e., to allow her children to attend school in Belmont, was frustrated by circumstances beyond her control, the rejection of their visa applications. Lastly, Yim claimed the Karaas failed to mitigate their damages subsequent to the breach.

After a jury-waived trial, the judge found for the Karaas, awarding them $19,861,[6] plus statutory interest of $5,106.23, and

---

[5] The Karaas voluntarily added twelve percent interest to this amount.

[6] The judge arrived at $19,861 by calculating as follows: rent of $4,300 per month for the seven-month period from December 1, 2010, through June 30, 2011 ($30,100); utilities for December of 2010, through March of 2011 ($1,800); and the real estate agent's fee of $750, for a total of $32,650. Subtracted from this amount was the rent collected from the successor tenant for the months of April, May, and June, 2011 ($4,200 per

attorney's fees in the amount of $24,098.70.[7]  The judge included

an offset of $189 for trebled interest on Yim's last month's

rent deposit,[8] though the judge otherwise dismissed the

counterclaims.

Discussion.  1.  The tenants' obligations under the lease.

A.  Yim's frustration of purpose defense.  Yim cannot be excused

from her obligation under the lease to pay rent on the basis of

a frustration of purpose argument.  Yim argues that her

principal purpose in leasing the property was to send her

daughter to school in Belmont, and that once her and her

family's visa applications were rejected, thereby preventing

them from reentering the United States, this purpose was

substantially frustrated.  Yim maintains that this frustration

discharged her obligations under the lease.

The Supreme Judicial Court has held that the doctrine of

frustration of purpose is a companion rule to the doctrine of

impossibility.  See Mishara Constr. Co. v. Transit-Mixed

---

month, totaling $12,600), and $189 for interest due to Yim on
the last month's rent.

[7] The terms of the lease provided the basis for the award of
attorney's fees.

[8] The judge held that because the Karaas paid no interest on
the last month's rent payment of $4,300, Yim was entitled to
recover five percent interest on that amount from June 16, 2010,
the date of commencement of the tenancy, through October 31,
2010, the last day she paid rent for the premises.  That
amounted to sixty-three dollars, which then was trebled in
accordance with the statute.  G. L. c. 186, § 15B(2)(a).

Concrete Corp., 365 Mass. 122, 128-129 (1974); Chase Precast Corp. v. John J. Paonessa Co., 409 Mass. 371, 374 (1991). "The principal question in both kinds of cases remains whether an unanticipated circumstance, the risk of which should not fairly be thrown on the promisor, has made performance vitally different from what was reasonably to be expected." Chase Precast Corp., supra (citations omitted). When applying the doctrine of frustration of purpose, a judge must consider "the foreseeability of the supervening event, allocation of the risk of occurrence of the event, and the degree of hardship to the promisor." Id. at 375 n.4. Given the importance of the factual context surrounding the lease agreement, the determination of these questions is reserved for the trier of fact. See Mishara Constr. Co., supra at 127, 130; Chase Precast Corp., supra at 376. In the case before us, the trial judge found the tenants' visa problems to be a foreseeable risk.

"[A] contracting party cannot be excused where the only 'frustration' consists in the fact that known risks assumed by him have turned out to his disadvantage." Baetjer v. New England Alcohol Co., 319 Mass. 592, 602 (1946). See Essex-Lincoln Garage, Inc. v. Boston, 342 Mass. 719, 721 (1961). The trial judge found that Yim "knew or should have known that there was a possibility that the family's visa status might change, and she voluntarily undertook that risk." The record supports

this conclusion.[9]  Thus, the trial judge was correct in finding that the doctrine of frustration of purpose did not excuse the tenants' obligations under the lease.

B.  CREDIT's obligations under the lease.  The tenants posit that CREDIT should not be held liable for breach of the lease due to the later substitution of the lease cover page, which listed Yim and Fong, not CREDIT, as tenants.  However, the tenants did not raise this issue in their pleadings or at trial.  Therefore, we decline to consider this argument, as it was not properly preserved for appeal.  See Milton v. Civil Serv. Commn., 365 Mass. 368, 379 (1974); R.W. Granger & Sons, Inc. v.

_____

[9] As stated in Yim's testimony at trial, the tenants planned their trip to China in large part because, though Yim had been granted L-1A status as of April 15, 2010, she and her children would need to reenter the country in order to secure their visas.  L-1A visas are available to executives and managers of international companies, and allow these foreign employees to relocate to their company's United States office or, for those foreign companies that do not yet have affiliated United States offices, allow them to send an executive or manager to the United States to help establish a United States office or subsidiary.  In order to qualify, the foreign employee must have worked abroad for the company for at least one continuous year within the three years prior to their admission into the United States.  Yet, Yim had spent the prior three years living in the United States to care for her children, who were attending United States schools.  The record shows that Yim and Fong submitted their visa applications months prior to their trip to China, with the assistance of legal counsel.  This, in conjunction with the trial judge's finding that Yim had prior experience traveling between the United States and China, suggests that Yim knew or should have known that she was in violation of her L-1A status.  These facts support the trial judge's conclusion that Yim knowingly and voluntarily undertook the risk that she and her family might not be able to reenter the United States.

J & S Insulation, Inc., 435 Mass. 66, 73-74 (2001); Reading Co-Op. Bank v. Suffolk Constr. Co., 464 Mass. 543, 545 n.1 (2013).

2. Burden to prove mitigation of damages. The tenants argued at trial that, despite the underlying breach of the lease, the Karaas failed to mitigate their damages by diligently attempting to relet the property. Nonetheless, the trial judge held that the Karaas "used reasonable precautions to mitigate their damages." In reaching her conclusion, the trial judge stated that the "defendant bears the burden of proving that a plaintiff has failed to mitigate [her] damages . . . [and] Yim has failed to meet her burden of proof on this issue." On appeal, the tenants argue that the trial judge improperly placed the burden of proof regarding mitigation on the tenants, and that the burden should have been on the Karaas, as the landlords.

Though who bears the burden at trial regarding the mitigation of damages within the landlord-tenant context is the subject of some uncertainty in Massachusetts,[10] we need not

_____

[10] In Woodbury v. Sparrell Print, the Supreme Judicial Court held that, in a claim for unpaid rent after termination of a tenancy, the burden falls upon the landlord to show a reasonable attempt to mitigate damages: "When therefore the answer sets up neglect of the plaintiffs it must be considered not as a defence in the way of confession and avoidance, but as a denial of the existence of one of the essential elements of the case of the plaintiffs, namely, due diligence as to reletting. The burden of showing due diligence was upon the plaintiffs." 198 Mass. 1, 10 (1908). However, more than eighty years later in Atkinson v.

resolve that issue here, as the trial judge explicitly found that the Karaas did in fact mitigate their damages by acting in a "timely and diligent manner" based on the evidence provided by the Karaas at trial. As discussed in the judge's order, the Karaas advertised the house for rent in early December, 2010, approximately one month after the tenants notified them of their intention to terminate the tenancy. The trial judge credited Shoreh's testimony that she and Fadi paid a fee of $750 to a real estate agent in an effort to relet the property. Moreover, the Karaas were able to secure a tenant by April of 2011, despite the difficulty of the winter rental market. Regardless of which party the burden ultimately fell on, the evidence supports the trial judge's conclusion that the Karaas indeed fulfilled their duty to mitigate their damages, and we decline to overturn such a finding.

3. <u>General Laws c. 186, § 15B</u>. We are confronted with how to apply the security deposit law requirements and penalties to

---

<u>Rosenthal</u>, this court took the opposite approach, stating that "the burden of proving that the landlord had not made a commercially reasonable lease, i.e., had not been diligent in obtaining a reasonably fair rent, fell on the tenants." 33 Mass. App. Ct. 219, 224-225 (1992). The case cited by the trial judge, <u>McKenna</u> v. <u>Commissioner of Mental Health</u>, addresses the burden of proof issue only in the context of labor and employment. 347 Mass. 674, 676 (1964). For further discussion of the uncertainty in the case law, see Daher & Chopp, Landlord and Tenant Law § 15:27, at 231-232 (3d ed. 2000); Warshaw, Massachusetts Landlord-Tenant Law § 6:10 (2d ed. 2001 & Supp. 2014).

the Karaas, who failed to place the security deposit in a separate account when their tenants, who terminated the lease seven months early, offered the security deposit and the last month's rent as compensation for the early termination. The Karaas returned the security deposit five months after the termination of the lease, shortly before bringing suit for breach of the lease for failure to pay rent. The tenants seek treble damages for the failure to segregate the security deposit and return it to them within thirty days of the termination of the lease. To resolve these claims, we must interpret the complicated interplay between three subsections of G. L. c. 186, § 15B: subsections (3)(a), (6), and (7), particularly as they have been interpreted in two prior decisions of this court, Castenholz v. Caira, 21 Mass. App. Ct. 758 (1986); and Taylor v. Beaudry, 75 Mass. App. Ct. 411 (2009), S.C., 82 Mass. App. Ct. 105 (2012) (Taylor I).

A. The Karaas' § 15B(3)(a) violation. Subsection (3)(a) "imposes two duties on the landlord: first, to establish the escrow account, and, second, to furnish the tenant with a conforming receipt, both within a thirty-day period measured from receipt of the security deposit." Castenholz, 21 Mass. App. Ct. at 760. The purpose of this subsection is to insure that "tenant monies are protected from potential diversion to the personal use of the landlord, earn interest for the tenant,

and are kept from the reach of the landlord's creditors."
Neihaus v. Maxwell, 54 Mass. App. Ct. 558, 561 (2002). Failure
to establish a separate, interest-bearing account or to provide
a tenant with an appropriate receipt represents a failure to
comply with the subsection, and entitles the tenant to
"immediate return of the security deposit." G. L. c. 186,
§ 15B(3)(a), as appearing in St. 1978, c. 553, § 2. See
Castenholz, supra.

In the instant case, the Karaas clearly violated these
requirements. The failure of the tenants to provide a Social
Security number did not preclude the Karaas from establishing a
separate account in compliance with § 15B. See Neihaus, supra
at 560-561 (security deposit held separately from landlord's
funds in management company's account, in combination with
management company's internal accounting system, did not violate
§ 15B[3][a]). The consequence of the violation, however, is
less obvious.

Subsection (3)(a) works in tandem with subsection (6). In
relevant part, subsection (6), as appearing in St. 1978, c. 553,
§ 2, provides: "The lessor shall forfeit his right to retain
any portion of the security deposit for any reason, or, in any
action by a tenant to recover a security deposit, to
counterclaim for any damage to the premises if he: (a) fails to
deposit such funds in an account as required by subsection (3)

. . . [or] (e) fails to return to the tenant the security deposit or balance thereof to which the tenant is entitled after deducting therefrom any sums in accordance with the provisions of this section, together with any interest thereon, within thirty days after termination of the tenancy."

The subsection (6) violations also trigger subsection (7), which provides:  "If the lessor or his agent fails to comply with clauses (a) . . . or (e) of subsection 6, the tenant shall be awarded damages in an amount equal to three times the amount of such security deposit or balance thereof to which the tenant is entitled plus interest at the rate of five per cent from the date when such payment became due, together with court costs and reasonable attorney's fees."  G. L. c. 186, § 15B(7), as appearing in St. 1978, c. 553, § 2.

However, the imposition of damages under subsection (7) is not automatic.  It first will depend on whether the violation at issue concerns subsection (6)(a) or (6)(e).  As this court explained in Castenholz, which involved a claim by a tenant still in possession of the leased premises, subsection (7) is triggered when the landlord "fails to comply with" the listed clauses of subsection (6), yet subsection (6)(a) does not include a deadline for returning forfeited funds to the tenant, thereby leaving no means for determining what qualifies as

noncompliance for the purpose of subsection (7).  Castenholz, 21 Mass. App. Ct. at 762.  See Taylor I, 75 Mass. App. Ct. at 414.

In an effort to uphold the security deposit law's original purpose of establishing "an equitable relationship between tenants and landlords," rather than "pillory[ing] the landlord" and being "arbitrarily penal," the Castenholz court emphasized that though a tenant may be entitled to return of a security deposit due to his landlord's noncompliance with subsection (3)(a), the landlord would not be held to be in violation of subsection (6)(a) unless, after the tenant demands return of the deposit, the landlord "refuses to acknowledge his error and return the deposit, thus forcing the tenant to employ legal process to vindicate his rights."  Castenholz, supra at 763 (citations omitted).

When applying the Castenholz framework, the facts before us do not support the Karaas' liability under subsection (7) based solely on their violation of subsection (3)(a).  Though the tenants' counterclaim functions as an adequate demand for the return of their security deposit, see Castenholz, supra at 764; Young v. Patukonis, 24 Mass. App. Ct. 907, 909 (1987), the Karaas did return the security deposit four days prior to the initiation of the underlying litigation and more than one month before the filing of the tenants' answer and counterclaims.  As such, the Karaas are in violation of subsection (3)(a), but have

not triggered the treble damages provisions of subsection (7) through a violation of (6)(a).  We turn next to the alleged violation of subsection (6)(e).

B.  The Karaas' alleged § 15B(6)(e) violation.  Subsection (6)(e) provides that a lessor forfeits his right to the security deposit if he "fails to return to the tenant the security deposit or balance thereof to which the tenant is entitled after deducting therefrom any sums in accordance with the provisions of this section, together with any interest thereon, within thirty days after termination of the tenancy."  G. L. c. 186, § 15B(6)(e).  Ordinarily, this subsection allows a landlord to withhold the entirety or a portion of a tenant's security deposit for unpaid rent that a tenant has not validly withheld. G. L. c. 186, § 15B(4)(i).  The trial judge here concluded that the Karaas could have kept the security deposit because the tenants "owed additional rent for the remaining lease term." The Karaas, however -- due to their failure to place the security deposit in a separate account -- already had forfeited their right to retain the security deposit "for any reason," including the use of the security deposit as an offset for unpaid rent.  G. L. c. 186, § 15B(6)(a).

The tenants argue that by holding onto the security deposit until September 25, 2011, more than five months after the end of the tenancy, the Karaas therefore violated subsection (6)(e) and

triggered the treble damages provisions of subsection (7). The tenants rest their argument on Taylor I. In that case a landlord returned a portion of a security deposit back to the tenants after making deductions for cleaning and repairs. 75 Mass. App. Ct. at 412. He did not make the deductions, however, in accordance with the statutory requirements,[11] and the tenant filed a complaint that the failure to return his entire deposit within thirty days violated subsection (6)(e). Ibid. After receiving the complaint, the landlord returned to the tenant the balance of the security deposit. Ibid. The trial judge declined to award treble damages but this court reversed, emphasizing that subsection (6)(e), unlike subsection (6)(a), includes a set deadline for compliance -- within thirty days of the termination of the tenancy. Id. at 415-416. Thus, the Taylor I court held that the Castenholz framework, which disallowed treble damages unless the landlord failed to return the deposit after the tenant demanded its return, "is inapplicable to a landlord's failure to return the tenant's security deposit within the specified thirty days. The statutory obligation to return the deposit is clear, as is the

---

[11] The landlord in Taylor I sent the tenant a check "with an undated letter explaining that the check covered the security deposit plus accrued interest," minus a sum "for cleaning and repairs to the tenant's apartment. The landlord did not sign the damage list under the pains and penalties of perjury, nor did he provide . . . any evidence . . . of the estimated or actual cost of repairing the damage." 75 Mass. App. Ct. at 412.

time within which the deposit must be returned.  Equally unambiguous are the consequences of failing to comply with that deadline."  Id. at 416.

However, Taylor I's strict application of subsection (7) did not involve tenants who specifically offered the security deposit as "compensation" for their breach of the lease.  Indeed, just the opposite was true in Taylor I:  the tenant in Taylor I steadfastly demanded return of the entire security deposit.  Id. at 412.  The record here indicates that the security deposit was the subject of much of the communication between the parties after the termination of the tenancy, with the tenants attempting to use the security deposit as a bargaining chip to avoid paying, and being sued about, the remaining four months' rent.  Where the tenants offer the security deposit as compensation for their own breach of the lease, a landlord's failure to return the security deposit within thirty days will not require an award of treble damages.  Rather, to avoid treble damages pursuant to subsection (7), the landlord must return the security deposit, as was done here, prior to the tenant's resort to litigation.

The security deposit law was designed to afford "a wronged tenant easy and inexpensive means of securing the repayment of the security deposit, with penalty awards in appropriate cases," Jinwala v. Bizzaro, 24 Mass. App. Ct. 1, 6 (1987), i.e., those

"that deal with conduct the Legislature considered 'particularly reprehensible.'" Taylor I, 75 Mass. App. Ct. at 415 (citations omitted). Though the Karaas violated § 15B(3)(a), the tenants' offer of the security deposit as compensation prevents us from concluding that the Karaas' failure to return it within thirty days was the type of reprehensible conduct the Legislature intended to target with subsection (7).

4. Evidence of attorney's fees. General Laws c. 186, § 15B(2)(a), requires a landlord who receives rent in advance for the last month of a tenancy to pay interest at the rate of five percent per year. After the parties' jury-waived trial, the trial judge found for the tenants on their G. L. c. 186, § 15B(2)(a), claim. In addition to providing a cause of action, § 15B(2)(a) also provides for the award of attorney's fees and court costs. Though the tenants assert that the trial judge abused her discretion by preventing the tenants from presenting evidence on this point, the record before us provides no support for this contention. The record and the trial judge's order support the conclusion that the tenants introduced no evidence at trial as to any court costs or attorney's fees they incurred in connection with recovering the interest owed on the last month's rent. The trial judge cannot be faulted for failing to admit evidence that was not offered at trial or even by way of posttrial motions. Moreover, by failing to argue this issue at

trial, the tenants have failed to preserve it for appeal, and it is therefore waived.  See Milton, 365 Mass. at 379; R.W. Granger & Sons, Inc., 435 Mass. at 73-74; Reading Co-Op. Bank, 464 Mass. at 545 n.1.

5.  The tenants' G. L. c. 93A claim.  Under G. L. c. 93A, § 2(a), only unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are prohibited.  In response to the tenants' claim that the Karaas violated § 2(a) by failing to set up a separate security deposit account, the trial judge found that the Karaas could not be liable under the statute because they were not "engaged in trade or commerce" when they leased their primary residence to the tenants.  Neihaus, 54 Mass. App. Ct. at 563 (isolated rental of home while owner temporarily living overseas did not amount to engaging in trade or commerce under G. L. c. 93A).  See Young, 24 Mass. App. Ct. at 910 (actions of owner-occupant of three-family building did not constitute trade or commerce).  Based on the judge's factual findings, we discern no error.

Even if we were to distinguish this case from Neihaus or Young by finding that the evidence of the Karaas' other real estate activities suggests that the Karaas were in fact engaged

in trade or commerce,[12] the tenants still have failed to provide sufficient evidence to support a claim for damages under G. L. c. 93A. The $4,300 security deposit together with interest at twelve percent was returned to the tenants prior to the commencement of litigation. The security deposit also was offered by the tenants as compensation for unpaid rent before it was returned.

"The invasion of a consumer's legal right (a right, for example, established by statute or regulation), without more, may be a violation of G. L. c. 93A, § 2, and even a per se violation of § 2, but the fact that there is such a violation does not necessarily mean the consumer has suffered an injury or a loss entitling her to at least nominal damages and attorney's fees; instead, the violation of the legal right that has created the unfair or deceptive act or practice must cause the consumer some kind of separate, identifiable harm arising from the violation itself." Tyler v. Michaels Stores, Inc., 464 Mass. 492, 503 (2013). In specifically overturning their decision in Leardi v. Brown, 394 Mass. 151 (1985), the Supreme Judicial

---

[12] Previously, the Karaas had rented out the property for a span of roughly five years, starting in the late 1990s. The Karaas also owned several other rental properties in the prior decade, up through the time of the trial. These facts are consistent with the trial judge's findings that the Karaas had prior experience as landlords, though the judge concluded that the Karaas were not engaged in trade or commerce in this instance, as the property was their primary residence.

Court held in <u>Tyler</u> that "a plaintiff bringing an action for damages under c. 93A, § 9, must allege and ultimately prove that she has, as a result, suffered a distinct injury or harm that arises from the claimed unfair or deceptive act itself." <u>Tyler</u>, <u>supra</u>.

The tenants here failed to present argument, both at trial and on appeal, regarding this most salient point. Thus, based on the record before us, the trial judge's holding that the Karaas are not liable under G. L. c. 93A must stand.

6. <u>Appellate attorney's fees</u>. The Karaas in their brief have requested, and we grant, an award of appellate attorney's fees pursuant to the lease, which provides for recovery of costs and attorney's fees for breach. In accordance with the procedure set forth in <u>Fabre</u> v. <u>Walton</u>, 441 Mass. 9, 10-11 (2004), the Karaas may file documentation in support of their request within fourteen days of the date of the rescript, and the tenants shall have fourteen days thereafter to respond.

<u>Judgment affirmed</u>.