Sanders, Janet L., J.
This case arises from plaintiffs’ purchase of common stock in the defendant Progressive Gourmet, Inc. (Progressive), a close corporation, and plaintiff George Noble’s loan to Progressive of $300,000. Plaintiffs asserted claims of fraud, violation of Chapter 93A, and breach of the promissoiy note, among other claims. Progressive and the individual defendants, all officers and/or directors of Progressive, responded with counterclaims for breach of fiduciary duty. On March 5, 2015, the parties reported to the Court that the case was settled. An Order for Entry of Dismissal Nisi (the Nisi Order) entered on March 10, 2015. A month later, a dispute among the parties arose as to whether a settlement had in fact been reached, with the defendants taking the position that certain material terms had not been agreed to. The case is before the Court on plaintiffs’ Motion to Enforce the Settlement. As already indicated in an earlier margin endorsement, this Court has concluded that the Motion must be Allowed.
BACKGROUND
In connection with the Motion, the parties submitted affidavits together with an appendix of email correspondence that included drafts , of various documents. A review of that material shows the following undisputed facts.
Settlement negotiations between the parties began almost immediately after suit was instituted. The negotiations included direct discussions between plaintiff Charles Minasian and Progressive CEO Richard Foster. There was also an exchange of written proposals, the last of which is a letter dated February 13, 2015 from plaintiffs’ counsel Thomas Fitzpatrick to plaintiffs counsel Raymond Ausrotas (the February 13 Letter). It begins by rejecting an earlier proposal of the defendants. It then goes on to outline the following terms:
1. The 1,290 shares of stock in Progressive that had been purchased by plaintiffs would be repurchased by the defendants at a total price of $770,607.56. That amount would become due “at closing (the ‘Closing’), which shall be no later than thirty days of the execution of the settlement agreement.”
2. As to the promissoiy note for $300,000 issued in connection with the loan that plaintiff Noble had made to Progressive, Progressive would pay to Noble all accrued interest due on that note as of the date of the Closing. The note would then be replaced with a new note for the same amount that would contain the following provisions (quoted verbatim from the February 13 Letter):
Principal Amount: $300,000
Interest: 8% per annum and a default interest rate of 15%.
Security: None.
Negotiable Instrument: Form of note shall be a negotiable instrument.
Cost of Collection: Progressive to be responsible for all costs of collection.
Payment terms: two equal payments of principal and interest December 31, 2015 and July 1, 2016.
Warrants: 4.25% to expire in 10 years from closing. Non-voting rights.
No legal fees due to Noble.
Progressive has approval to pay principal and interest from all parties needing to give approval, debtors, board and investors. Proper language will be determined by attorneys later on dilution and warrants.
The February 13 Letter also provided for an unconditional release among the parties and dismissal of the instant case with prejudice. Sometime before this letter, Minasian had asked Progressive’s CEO Foster how Progressive intended to fund an earlier proposal made by defendants and was told that Progressive was expecting the money would be coming from an outside investor.
At the same time that he sent the February 13 Letter to Ausrotas (via email and regular mail), Fitzpatrick forwarded the letter by email to his client, plaintiff Minasian; Ausrotas in turn emailed a copy to Foster. That same day, there was direct discussion between Minasian, Noble and Foster. Minasian then sent an email to Foster, with copies to Noble and the two attorneys on the afternoon of February 13; attached to the email was the February 13 Letter. That email stated: “I believe this is the new term sheet Rich [Foster], George [Noble] and I agreed on.” Less than an hour later, Foster responded: “Thanks Charlie.” On February 18, 2015, Ausrotas emailed Fitzpatrick, stating: “Hi Tom, following up, it is my understanding that our clients have reached an agreement in principle on *154 their terms. Can you confirm that on your end? I will be back in the office next week after school vacation so that we can memorialize.” Fitzpatrick responded by email three hours later: “That is my understanding as well. I am on vacation too. Let’s talk Monday.”
The parties understood that several documents would need to be prepared: they included a formal settlement agreement, a new promissory note, a stipulation of dismissal and a stock purchase warrant. Fitzpatrick prepared drafts of all of those documents over the next ten days and sent them to Ausrotas to review. In the meantime, the parties were scheduled to appear in court on March 10, 2015 for a hearing on a motion to dismiss. They initially asked the Court (Roach, J.) to continue the hearing for thirty days so that the settlement documents could be finalized, but the clerk informed them that the judge insisted that either the hearing take place as scheduled or that a 30-day nisi order enter if the case was in fact settled. Counsel conferred and on March 5, 2015 agreed to report the case settled, at which point the Nisi Order entered. The parties agreed to a closing date of April 6, 2015.
Between the end of February and the first week of April, the attorneys exchanged red lined versions of settlement documents. The changes that were made were not substantial. There was some discussion about a “cure period” should Progressive default on the new note that was contemplated by the settlement; ultimately a seven-day cure period was agreed to. As to the stock warrants, there was more lengthy discussion, but ultimately an agreement was reached as to the warrants as well, with the number of stock warrants agreed to (410 shares) exactly corresponding to the 4.25 percent of all shares set forth in the February 13 Letter. Fitzpatrick had his clients sign all the necessary settlement documents. On April 6, 2015, defense counsel Sam Anderson sent Fitzpatrick an email, with a copy to Ausrotas, saying that “we have reached agreement on all the settlement documents relating to the Noble settlement.” The email continued: “As I mentioned last week, we likely will not have all the funding for this settlement for another week or so. Please let me know if it works for you to hold everything in escrow pending funding on or before the 15th of April (maybe sooner)?” A postponement was agreed to.
Pending the closing, counsel worked out a protocol by which defendants’ funds would be moved to Ausrotas’ IOLTA account, then wired to Fitzpatrick’s IOLTA account. Ausrotas was scheduled to be out of town for the week of April 15, 2015 and emailed Fitzpatrick in order to give him the name of his colleague Michael Drier. That email, dated April 17, 2015, stated: “In the event this goes to closing, which we certainly hope it does, Mike will be able to get you an original note signed by our client, get the original stock certificates from you and make sure any wires that are needed to leave our firm were taken care of.” As it turned out, the money from the outside investor in Progressive did not materialize. On April 20, 2015, defense counsel informed Fitzpatrick that the defendants would not be able to close without the money from the outside investor and asked to negotiate a new settlement on different terms. Fitzpatrick declined and this Motion followed.
DISCUSSION
In opposing the motion, defendants make essentially two arguments. First, they contend that well after the February 13, 2015 Letter, the parties continued to negotiate the terms of any settlement and that one of those terms was that the agreement would be reduced to writing; because no settlement documents were actually executed by the plaintiffs, then (it is argued) there is no enforceable contract. Second, defendants contend that the funding from the outside investor was either a condition precedent to the agreement or alternatively rendered its performance impossible. This Court is not persuaded by either argument.
An agreement is an enforceable contract if it includes all material terms, and the parties have manifested an intention to be bound by those terms at the time of formation. Situation Mgmt Sys., Inc. v. MaLouf, Inc., 430 Mass. 875, 878 (2000). In the instant case, the February 13 Letter included all material terms. Although the details of the underlying settlement documents were negotiated over the next six weeks, the changes that were made by the defendants were not material and in any event were all agreed to by the plaintiffs. This went far beyond the “imperfect negotiation” that courts have determined to impose no enforceable obligations.
The defendants argue that there was no intent on their part to be bound until and unless they had executed the final settlement documents, which never occurred. But it has long been recognized that, “if all material terms which are to be incorporated into a future writing have been agreed upon, it may be inferred that the writing to be drafted is a mere memorial of the contract, as long as there has been mutual assent of the parties to those terms.” Rosenfeld v. United States Trust Co., 290 Mass. 210, 216 (1935). Thus, the SJC held in McCarthy v. Tobin, 429 Mass. 84 (1999), that an accepted offer to purchase real estate could be enforceable even without a written purchase and sale agreement so long as that offer contained all material terms and the parties manifested an intent to be bound by those terms. That is because final documents (there the P&S agreement) served only as a “polished memorandum of an already binding contract.” 429 Mass, at 37, quoting Goren v. Royal Inv., Inc., 25 Mass.App.Ct. 137, 140 (1987). That is equally true here: as of February 13, 2015, the parties had (as defense counsel described it in one email) an “agreement in principle.” Even assuming that the details of that agreement still had be worked out, it was clear that the parties had agreed to all such details before April 20, 2015 when defendants announced that they did not intend to honor the settlement.
The defendants next argue that the settlement was contingent on Progressive securing outside financing and *155 that without such financing, Progressive lacked the cash or liquid assets to comply with the settlement terms. They maintain that this financing was in effect a condition precedent, which if not fulfilled, means that no binding agreement came into existence. As the plaintiffs point out, however, a condition precedent to performance can be found only when the parties’ intent regarding such a condition is clearly manifested in the contract itself. See Mass. Mun. Wholesale Elec. Co. v. Danvers, 411 Mass. 39, 45 (1991), and cases cited therein. At best, the record before me shows only that Foster at some point told Minasian (when asked how Progressive was going to fund the settlement) that the money was coming from an outside investor. Nothing in the February 13 Letter nor in the subsequent documents and emails that were exchanged indicated that the defendants were agreeing to the settlement only if this funding were available.
The defendants argue in the alternative that the unavailability of this funding made the agreement impossible to perform such that the principal purpose for the contract was frustrated. That doctrine may be invoked, however, only where an unanticipated circumstance develops that could not be reasonably foreseen by the promisor, such that his performance becomes vitally different from what was reasonably to be expected. Karaa v. KukYim, 86 Mass.App.Ct. 714, 717-18 (2014). Stated another way, a “contracting party cannot be excused from performance where the only ‘frustrations consists in the fact that known risks assumed by him have turned to his disadvantage.” Baetjer v. New England. Alcohol Co., 319 Mas. 592, 602 (1946). Certainly, the defendants knew or should have known that there was a risk the outside investor could walk away. Nor was this risk something that the plaintiffs agreed to shoulder.
Accordingly, for all the foregoing reasons, the Motion to Enforce the Settlement is ALLOWED. This Court is not clear as to the judgment that should enter in this case, however, and therefore invite the parties to submit a proposed form of judgment within ten days of receipt of this decision.