SUPERIOR COURT 
 
 BETH ISRAEL DEACONESS MEDICAL CENTER, INC. THE BRIGHAM AND WOMEN’S HOSPITAL, INC. DANA-FARBER CANCER INSTITUTE, INC. JOSLIN DIABETES CENTER, INC. PRESIDENT AND FELLOWS OF HARVARD COLLEGE THE CHILDREN’S HOSPITAL CORPORATION v. MATEP LLC

 
 Docket:
 2384CV01373-BLS2 / 2384CV01376-BLS2 / 2384CV01379-BLS2 / 2384CV01381-BLS2 / 2384CV01382-BLS2 / 2384CV01385-BLS2
 
 
 Dates:
 March 1, 2024
 
 
 Present:
 Kenneth W. Salinger
 
 
 County:
 SUFFOLK
 

 
 Keywords:
 DECISION AND ORDER ON CROSS-MOTIONS FOR JUDGMENT ON THE PLEADINGS
 
 

 The plaintiffs (which the parties call the “Hospitals”) operate hospitals or medical educational institutions in the Longwood Medical Area of Boston. Each Hospital contracted to buy a reliable and uninterruptible supply of electricity from the Medical Area Total Energy Plant (the “Plant”), which is now owned by MATEP LP and operated by MATEP LLC (collectively “MATEP”).[1]
Starting in January 2022, MATEP has increased the prices that it charges the Hospitals for electricity to impose a “Reliability Adder” on top of market rates, saying that this additional charge is needed to cover increases in MATEP’s cost to provide completely reliable electric service. The Hospitals seek a declaratory judgment that the Reliability Adder violates the Hospitals’ Amended Utilities Contracts with MATEP LLC (the “AUCs”). MATEP seeks a declaratory judgment that the Reliability Adder is permissible. The parties have filed cross- motions for partial judgment on the pleadings as to this claim and counterclaim.[2] The Court will allow the Hospitals’ motion for declaratory relief in its favor, and deny MATEP’s motion, because the AUC’s do not permit MATEP do include such a Reliability Adder in its charges for electricity.
 
--------------------------------------------
 
[1] MATEP LLC is owned by MATEP LP, which in turn is owned by Longwood Energy Partners LLC, through Longwood’s ownership of MATEP LP’s general partner and Longwood’s position as the sole limited partner of MATEP LP.
[2] The Hospitals assert other claims seeking declaratory relief as to whether a competitive, comparable market for electricity exists and also seeking damages on theories of breach of contract, unjust enrichment, and that defendants engaged in unfair or deceptive acts or practices in violation of G.L. c. 93A, § 11.
 
                                                            -1-
 
1. Factual Background. The pleadings, the exhibits attached to the complaints, and the parties’ memoranda of law establish that the following background facts are not contested.[3]
Harvard University first built a powerhouse to provide electricity for the Harvard Medical School in 1906. It later added steam and chilled water capabilities. Harvard built the current Plant in the 1980s, and owned and operated the facility until 1998. During that period, Harvard sold electricity to the other Hospitals, using the rate structure of the Boston Edison Company (which later became known as Eversource) as the “reference standard” for the price that it charged those Hospitals.
In late 1997, anticipating partial restructuring or deregulation of the local electricity market, Harvard and the other Hospitals entered into a new contract that they called the “Third Amendment.” This new contract allowed Harvard to charge “pricing comparable to pricing available in a competitive market for levels of service comparable to that required to be provided by Harvard.” More specifically, it provided that Harvard would continue to charge the same amount that the other Hospitals would have been required to pay Boston Edison, until a competitive market arises in which the Hospitals could purchases electricity at comparable levels of serve and reliability. If and when comparable supplies became available from new competitors, the “reference standard” for the price Harvard could charge for the Plant’s electricity would change to the price of such alternative, competitive supplies of electricity.
Harvard sold the Plant and MATEP to Advanced Energy Systems, Inc., in 1998. AES then supplied electricity to the Hospitals, including Harvard, under the terms of the Third Amendment. At some point, either as part of its acquisition
 
--------------------------------------------
 
[3]  Defendants admitted most of the factual allegations discussed in this opinion  in their answers to the Hospitals’ complaints. For other allegations, defendants state in their answers that they “are without information or knowledge sufficient to respond to the allegations” in those paragraphs. Those responses have the effect of a denial. See Mass. R. Civ. P. 8(b). But the MATEP Defendants went on to admit the truth of some of these allegations in their memorandum in support of defendants’ motion for judgment on the pleadings. The Court accepts as true facts that defendants effectively denied in their answers but then admitted in their memorandum. None of the allegations that defendants effectively denied in their answers but then admitted in their memorandum is material in deciding the pending motions for partial judgment on the pleadings, but some of them provide useful context for this dispute.
 
                                                            -2-
 
or thereafter, AES transferred ownership of and responsibility for operating the Plant to Medical Area Total Energy Plant, Inc., and MATEP LLC.[4]
Then, in 2015, MATEP LLC entered into Amended Utilities Contracts with the Hospitals. The key terms of those AUCs are discussed in the following section.
Longwood Energy Partners acquired the Plant and MATEP LLC from AES on March 30, 2018. Longwood transferred ownership of the Plant and of MATEP LLC to a new subsidiary, MATEP LP, which is owned by Longwood. After the sale to Longwood, MATEP has continued to provide reliable electricity to the Hospitals under the 2015 AUCs.
It appears to be undisputed that, from 2001 through 2021, MATEP LLC charged the Hospitals for electricity based on a reference price that was designated for each year by the Hospitals and accepted by MATEP. The Hospitals contend that these reference prices were based on the prices paid for electricity supplied to an exemplar building in the Longwood Medical Area that has load factor characteristics comparable to the Hospitals; MATEP says it lacks information or knowledge to respond to this allegation, and thus has effectively denied it. See Mass. R. Civ. P. 8(b).
In 2021, the Hospitals designated a proposed reference standard for MATEP electricity prices over the next two calendar years. In January 2022, MATEP notified the Hospitals that MATEP did not accept the designation. MATEP took the position that the proposed reference price “does not adequately reflect the ‘comparable level of service’ standard required under the [AUC].”
MATEP proposed using the reference price proposed by the Hospitals as a starting point, but adding to it an additional charge that MATEP dubbed a “Reliability/Firmness Adder;” MATEP designed this additional charge to recoup what MATEP said were unexpected capital costs that it was going to have to incur over the next three to five years.
MATEP sent the Hospitals a draft Memorandum of Understanding in which MATEP described the proposed Reliability/Firmness Adder as an extra charge
 
--------------------------------------------
 
[4] As of 2001, the Plant was owned and operated by Medical Area Total Energy Plant, Inc., and MATEP LLC. See Beth Israel Deaconess Medical Center, Inc. v. MATEP LLC, Suffolk Sup. Ct. civ. action no. 994530BLS, 2001 WL 1029616, at *1 (June 25, 2001) (van Gestel, J.), and Mass. App. Ct. No. 01-P-1694, 2004 WL 369098, at *1 (Feb. 27, 2004). Cf. Reliance Ins. Co. v. City of Boston, 71 Mass. App. Ct. 550, 555 (2008) (records of related court proceedings are subject to judicial notice and may be considered in deciding motion to dismiss).
 
                                                            -3-
 
that “reflects the value of the Reliability of MATEP’s firm service” to the Hospitals. The draft MOU went on to assert that the reliability of electricity supply mandated by the AUCs:
o “is a unique attribute of MATEP’s level of service;”
o “is a necessary component in determining the comparability of MATEP’s service” under the AUCS “compared to the services provided by Suppliers in the competitive market;” and
o “cannot be supplied by third party competitive electricity suppliers,” and therefore is not included in the reference price proposed by the Hospitals or in supply price bids by other competitive suppliers.
The Hospitals did not agree to pay the extra charge sought by MATEP in its proposed Reliability Adder. MATEP has nonetheless billed the disputed Reliability Adder to the Hospitals since January 2022.
2. Key Contract Terms. MATEP LLC entered into an AUC with each Hospital in September 2015, in which it agreed to provide all of the electricity, steam, and chilled water required by that Hospital. The AUCs are long-term contracts. The initial term of the contract does not expire until September 30, 2051. Each AUC provides that it is governed by Massachusetts law.
The parties agreed, in paragraph 20(a), that the AUCs “shall supersede all prior agreements” regarding the purchase of electricity and other utilities from the Plant, and that each AUC “shall constitute a complete integration of the agreement between the parties with respect to the subject matter of this Amended Utilities Contract….”
MATEP acknowledged in each contract “that a reliable supply of the Users requirements for Utilities is critical to the User.” See AUC ¶ 1(a). It contracted to “provide continuous delivery” of each Hospital’s requirements for electricity and other covered utilities at all times, and to “avoid non-delivery” of electricity and other covered utilities “at any time.” MATEP is required to deliver the agreed-upon supplies of electricity even if the Plant is not in service, for any reason, and MATEP must obtain electricity from another source in order to meet the Hospitals’ needs. See AUC ¶¶ 6(d)(iii) & 9(d)(I).
The parties agreed that MATEP would provide electricity “on the basis of pricing comparable to pricing available in a competitive market for levels of service comparable to that required to be provided by MATEP pursuant to this
 
                                                            -4-
 
Amended Utilities Contract, all as more specifically provided in this Amended Utilities Contract” (emphasis added). See AUC ¶ 1(c).
The details for electricity pricing are set forth in Section 5(a). This section provides that MATEP must charge rates equal to one of two different market benchmarks of rates that are actually paid by other customers.
One possible benchmark is to charge the rates set in “the applicable rate schedules actually in general use by customers of Eversource having demand and consumption characteristics similar to” the Hospital (emphasis added). See AUC ¶ 5(a)(I). The “applicable rate schedule” is Eversource’s G-3 tariff if that is still in effect, or the successor tariff that most closely approximates the G-3 tariff. Id. ¶ 5(a)(ii). If this pricing benchmark applies, then each Hospital must pay MATEP the dollar amount that it “would have been required to pay to Eversource” if the Hospital had obtained its electricity from Eversource instead of from the Plant. Id. ¶ 5(a)(I).
The other benchmark must be used instead if “a competitive market arises in which alternative supplies of electricity at comparable levels of service with specifications and reliability standards at least equal” to those required in the AUC “are actually available … under firm (non-interruptible) agreements” (emphasis added). AUC ¶ 5(a)(ii)(A). When that condition is met, MATEP may no longer charge the Eversource rate but must instead charge “the price … of such alternative supplies” (emphasis added). Id. ¶ 5(a)(ii)(B). Comparable alternative supplies are deemed “actually available” if the Hospital “could contract for and obtain delivery of” such alternative supplies, in the absence of its contract with MATEP. Id. ¶ 5(a)(ii)(A).
3. Analysis. The Court finds that the parties’ Amended Utilities Contracts are unambiguous; their meaning is therefore a question of law that the Court may decide on the pending cross-motions for judgment on the pleadings.[5] Whether
 
--------------------------------------------
 
[5] See Eigerman v. Putnam Investments, Inc., 450 Mass. 281, 287 (2007) (affirming dismissal of contract claim); accord Flomenbaum v. Commonwealth, 451 Mass. 740, 751-752 & n.12 (2008) (granting motion to dismiss because plain language of contract made clear that Commonwealth could terminate chief medical examiner before completion of five-year term).
The parties’ cross-motions for judgment on the pleadings are governed by the same standards as a motion to dismiss a counterclaim for failure to state a claim upon which relief can be granted. See Boston Med. Ctr. Corp. v. Secretary of the Exec. Office of Health and Human Svcs., 463 Mass. 447, 450 (2012).
 
                                                            -5-
 
language used in a contract “is ambiguous is also a question of law for the court.”[6] Even contracts that are a bit convoluted or hard to parse, like these AUCS, may be unambiguous.[7] And the fact that the parties disagree about how to read their contracts does not make them ambiguous either.[8]
3.1. The Contractual Price Reference Standards. The AUCs provide that MATEP’s electricity prices must be set by reference to one of two real-world sets of comparable prices that are actually charged to other customers.
When MATEP proposed the Reliability Adder in January 2022, it took the position that competitive electricity suppliers are not able to provide service that meets the reliability standards required under the AUCs. If that were true, then MATEP would be required to charge the same amount that the Hospitals would have to pay to get their electricity from Eversource, under the Eversource G-3 or successor tariff. See AUC ¶ 5(a)(I). MATEP would have to do so by charging prices set in Eversource tariffs that are “actually in general use” by customers similar to the Hospitals. Id.
The Hospitals contend that comparable supplies of electricity that can meet the reliability standards required in the AUCs have been available in the competitive market for at least twenty years, and that such competitive, comparable supplies are still available in the market today.9 If that proves to be
 
--------------------------------------------
 
[6] Berkowitz v. President & Fellows of Harvard College, 58 Mass. App. Ct. 262, 270, rev. denied, 440 Mass. 1101 (2003) (ordering dismissal of complaint for failure to state a viable claim for breach of contract).
[7] See Sullivan v. Southland Life Ins. Co., 67 Mass. App. Ct. 439, 443 (2006) (“difficulty in comprehension does not equate with ambiguity”) (quoting Mass. Prop. Ins. Underwriting Ass'n v. Wynn, 60 Mass. App. Ct. 824, 827 (2004)).
[8] See Indus Partners, LLC v. Intelligroup, Inc., 77 Mass. App. Ct. 793, 795 (2010) (“ambiguity is not created simply because a controversy exists between parties, each favoring an interpretation contrary to the other’s”) (quoting Jefferson Ins. Co. v. Holyoke, 23 Mass. App. Ct. 472, 475 (1987)).
[9] The Hospitals also claim that a judgment entered against MATEP LLC in 2001 “estops Defendants from asserting that a competitive, comparable market does not exist.” To invoke the doctrine of collateral estoppel or issue preclusion successfully, the Hospitals will have to show not only that this issue was adjudicated in the prior case, but also that there has been no material change of circumstances since then. See generally Barry v. Planning Bd. of Belchertown, 96 Mass. App. Ct. 314, 322 (2019) (“a previously adjudicated issue is not ‘identical’ for purposes of collateral estoppel, where the facts material to the subsequent litigation have changed since the prior adjudication”).
 
                                                            -6-
 
correct, then under the plain language of the AUCs the price that MATEP charges the Hospitals for electricity must match the price that is actually charged in the competitive market for a comparable, equally reliable supply of electricity. See AUC ¶ 1(c), ¶ 5(a)(ii)(A) & (B).
3.2. No Hypothetical Pricing Standard Allowed. MATEP insists that it has a contractual right to adopt a third pricing alternative. MATEP asserts that it may charge “what the Hospitals would pay if they were buying electricity in a competitive market that had comparable reliability and firmness features, like that supplied by MATEP.” MATEP goes on to argue that its Reliability Adder“ accounts for the true price of MATEP’s service were it to be sourced in the competitive market.”
In other words, MATEP contends that, although competitive suppliers are (according to MATEP) not currently pricing and providing electric supplies that meet the AUC reliability requirements, MATEP may charge a higher rate based on its estimate of what a hypothetical competitive supplier would charge if it was asked and it agreed to offer a comparably reliable supply of electricity.
That is incorrect.
The AUC makes clear that the prices charged by MATEP for electricity must be pegged to actual market prices, charged either by Eversource or by competitive suppliers that offer comparably reliable service, and may not charge prices by reference to a hypothetical offering that is not actually available in the market.
The AUC adopts a “comparability” principle, requiring that MATEP must provide electricity “on the basis of pricing comparable to pricing available in a competitive market” for comparably reliable service. See AUC ¶ 1(c). It then provides that Eversource tariff rates will apply unless and until competitive, comparably reliable supplies of electricity “are actually available” in the market. Id. ¶ 5(a)(ii)(A). Under those circumstances, the new “reference standard” for MATEP’s electricity rates “shall be the price, from time to time, of such alternative supplies.” Id. ¶ 5(a)(ii)(B).
Reading these provisions together as a coherent whole, as the Court must do,[10] it is clear that “such alternative supplies” refers to supplies that are “actually
 
--------------------------------------------
 
[10]      See, e.g., General Convention of the New Jerusalem in the United States of Am., Inc.
v. MacKenzie, 449 Mass. 832, 835 (2007) (“The words of a contract must be considered in the context of the entire contract rather than in isolation.”).; Kingstown Corp. v. Black Cat Cranberry Corp., 65 Mass.  App. Ct. 154, 158 (2005)
 
                                                            -7-
 
available” in the market, the price of competitive supplies that is to serve as a “reference standard” must be pricing that is actually “available in a competitive market,” and “actually available” means supplies that are actually being provided and prices that are actually being charged to some other customer.
MATEP’s assertion that “actually available” refers instead to hypothetical supplies and prices that no supplier offers and no customer pays today, but that a competitive supplier might offer if a Hospital or other company solicited bids for a comparably reliable and uninterruptible supply of electricity, cannot be squared with the plain language used in the AUCs. MATEP seeks to set electricity prices based on a thought experiment about what might happen someday in the competitive market. It has no contractual right to do so.
The AUCs require that if a comparable, competitive market exists then MATEP must charge the prices for comparably reliable supplies of electricity that are in fact available and are being paid in the real world. Construing the AUCs as written in no way strips the repeated contractual references to reliable and uninterruptible supply of any meaning, as MATEP wrongly asserts.
In sum, MATEP’s attempt to assess an entirely hypothetical rate that starts with competitive prices available in the market, and then tacks on a “Reliability Adder” designed to ensure that MATEP makes the kind of profit it wants to realize, violates the plain language of the AUCs.
3.3. No Contractual Right to Cost-Plus Pricing. When it first proposed assessing an extra charge for electricity that it called a “Reliability/Firmness Adder,” MATEP represented that it was facing “significantly higher than anticipated operating costs … associated with unplanned maintenance and project costs.” MATEP now defends its Reliability Adder on the ground that it MATEP is entitled to charge “an increased electricity price to account for added costs … of ensuring reliable service.”[11] The Court disagrees.
This does not mean, as MATEP argues, that MATEP is being forced to provide highly  reliable  supplies  of  electricity  “for  free.” Nor is MATEP  allowed  to
 
--------------------------------------------
 
(“[T]he parties’ intent ‘must be gathered from a fair construction of the contract
as a whole and not by special emphasis upon any one part.’ ”) (quoting Ucello
v. Cosentino, 354 Mass. 48, 51 (1968), and Crimmins & Peirce Co. v. Kidder Peabody Acceptance Corp., 282 Mass. 367, 375 (1933)).
[11]      See MATEP’s motion at 5–6; see also id. at 8 (arguing MATEP may “charge for the increased costs associated with providing reliable services”).
 
                                                            -8-
 
disregard the AUC pricing requirements because it fears that they will result in MATEP “consistently spending more than it receives in revenue.”
MATEP negotiated and agreed to the contract terms that define and limit what it may charge for electricity. The plain and unambiguous language in the AUCs “must be enforced according to its terms.” See A.L. Prime Energy Consultant, Inc. v. Mass. Bay Transp. Auth., 479 Mass. 419, 428 (2018), quoting Schwanbeck v. Federal-Mogul Corp., 412 Mass. 703, 706 (1992).
That MATEP is now unhappy with the deal that it struck, and fears it will lose money if MATEP cannot charge more than it bargained for, does not change the plain meaning of its contract terms. “[S]ophisticated parties are bound by the terms of their agreement. Even if the bargain they strike ends up a bad deal for one or both parties, the court's role is to enforce the agreement as written.” Glaxo Grp. Ltd. v. DRIT LP, 248 A.3d 911, 919 (Del. 2021). “Parties have a right to enter into good and bad contracts, the law enforces both.” Id., quoting Nemec v. Shrader, 991 A.2d 1120, 1126 (Del. 2010). In other words, a court may not “relieve sophisticated parties” like MATEP “of the burdens of contracts they wish they had drafted differently.” CompoSecure, L.L.C. v. CadUX, LLC, 206 A.3d 807, 811 n.6 (Del. 2018), quoting DeLucca v. KKAT Mgmt., L.L.C., C.A. No. 1384-N, 2006 WL 224058, at *2 (Del. Ch. Jan. 23, 2006).
Though Glaxo Grp., Nemec, and CompoSecure were applying Delaware law, the same principles apply under Massachusetts law. Since MATEP and the Hospitals are sophisticated parties that “choose to embody their agreement in a carefully crafted document,” they must be “held to the language they chose.” Fronk v. Fowler, 71 Mass. App. Ct. 502, 508 (2008), quoting Anderson St. Assocs. v. Boston, 442 Mass. 812, 819 (2004). MATEP cannot escape the AUCs’ pricing requirements merely because “known risks” assumed by MATEP “turned out to [its] disadvantage.” Karaa v. Kuk Yim, 86 Mass. App. Ct. 714, 718 (2014), quoting Baetjer v. New England Alcohol Co., 319 Mass. 592, 602 (1946).
3.4. No Contract of Adhesion. MATEP’s further contention that enforcing the AUCs as written “would convert the parties’ agreement into a contract of adhesion” lacks any substance.
“A contract of adhesion is one that is ‘drafted unilaterally by the dominant party and then presented on a ‘take-it-or-leave-it’ basis to the weaker party who has no real opportunity to bargain about its terms.’ ” Empire Loan of Stoughton, Inc. v. Stanley Convergent Sec. Solutions, Inc., 94 Mass. App. Ct. 709, 715 (2019), quoting Restatement (Second) of Conflict of Laws § 187, comment b (1971).
 
                                                            -9-
 
That is not what happened here. The pleadings and exhibits make clear that the MATEP parties are sophisticated business entities that actively negotiated and then accepted the terms of the AUCs. MATEP LLC stipulated in each AUC that each of those contracts with the Hospitals “is the result of negotiations between, and has been reviewed by, each of the parties and their respective counsel. Accordingly, this Amended Utilities Contract shall be deemed to be the product of both parties[.]” AUC ¶ 23(f).
It follows that these are not adhesion contracts. See, e.g., Empire Loan of Stoughton, Inc. v. Stanley Convergent Security Solutions, Inc., 94 Mass. App. Ct. 709, 715–716 (2019) (contract subject to negotiation among sophisticated parties not a contract of adhesion).
3.5. Conclusion. MATEP must comply with the terms of the deal that they struck. For the reasons stated above, the Hospitals are entitled to declaratory relief on their favor on their claim that the Reliability Adder is not allowed under the parties’ contracts,[12] and to a declaration that the MATEP defendants are not entitled to the contrary declaratory relief sought in their counterclaim.[13]
ORDERS
Plaintiffs’ motion for partial judgment on the pleadings is allowed. Defendants’ motion for partial judgment on the pleadings is denied. Plaintiffs are entitled to declaratory judgment in their favor on count I of their complaint and on Defendants’ counterclaim.
When final judgment enters in these actions, it shall include declarations that:
(1) the Reliability Adder charge for electricity that has been assessed by Defendants is invalid under and violates the Amended Utilities Contracts between MATEP LLC and each of the Plaintiffs, and (2) based on the plain language of the contracts cited in the pleadings, Defendants are not entitled to the declaratory relief sought in their counterclaim.
 
--------------------------------------------
 
[12] See generally Barron v. Kolenda, 491 Mass. 408, 414–415 & 425 (2023) (where appropriate, courts may declare rights of parties in decision motion for judgment on the pleadings); Sahli v. Bull HN Info. Sys., Inc., 437 Mass. 696, 705 (2002) (“The determination of contractual rights is a proper subject of a declaratory judgment proceeding.”).
[13] Buffalo-Water 1, LLC v. Fidelity Real Estate Co., LLC, 481 Mass. 13, 18 & 20 (2018).
 
                                                            -10-
 
The Court will conduct a further Rule 16 scheduling conference in the next 60 to 90 days to set a schedule for resolving the remaining claims. In the meantime, the parties shall meet and confer about possible resolution of their dispute.