SUPERIOR COURT 
 
 10 HIGH STREET RESTAURANT, LLC v. JOHN F. POWER AND JOHN NILES, TRUSTEES OF THE KNH REALTY TRUST JOHN F. POWER AND JOHN NILES, TRUSTEES OF THE KNH REALTY TRUST v. SETH GREENBERG

 
 Docket:
 2084CV02548-BLS2 / 2184CV00599-BLS2
 
 
 Dates:
 April 16 2024
 
 
 Present:
 Kenneth W. Salinger
 
 
 County:
 SUFFOLK
 

 
 Keywords:
 DECISION AND ORDER ON CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT
 
 

 Seth Greenberg used to operate a restaurant called Serafina in Boston’s Financial District, in space that the KNH Realty Trust leased to 10 High Street Restaurant, LLC (“High Street”). Mr. Greenberg was High Street’s Manager. KNH terminated the Lease in July 2020, based in part on High Street’s failure to pay rent during the height of the COVID-19 pandemic, and in part on its failure to cure alleged breaches before the pandemic struck.
High Street filed suit claiming that KNH had no grounds to terminate the Lease and thus committed a breach of contract by doing so, and it was unlawful for KNH to notify High Street’s lender (BankNewport) about the termination. In turn, KNH asserted counterclaims against High Street for allegedly breaching the lease and engaging in unfair trade practices by trying to pressure KNH into modifying the Lease terms. KNH also brought a separate action to enforce Greenberg’s personal guaranty of High Street’s obligations under the Lease, and alleging that Greenberg participated in the same unfair trade practices and engaged in abuse of process by causing High Street to sue KNH.
The parties’ cross-motions for partial summary judgment focus on whether High Street was excused from paying rent while emergency orders by the Governor barred indoor dining at restaurants, at the pandemic’s start. But the summary judgment record establishes that High Street was in material default before the pandemic hit because it refused to pay the cost of cleaning up grease that escaped from High Street’s grease trap system. KNH was entitled to terminate the Lease for this reason alone.

-1-

The Court will deny High Street’s motion for partial summary judgment on its claims for breach of contract, allow in part KNH’s motion for partial summary judgment as to liability on all claims and counterclaims, and grant partial summary judgment in favor of High Street and Mr. Greenberg on KNH’s claims under G.L. c. 93A, for abuse of process, and for breach of implied covenants of good faith and fair dealing, even though High Street and Greenberg did not seek summary judgment on those claims. It will do so because the summary judgment record establishes the following.
o KNH’s notice terminating the Lease was valid because High Street did not pay roughly $21,000 that it owed KNH, since well before the COVID-19 pandemic, for clean-up costs incurred by KNH after High Street’s grease trap system failed and fouled the area. KNH did not breach the Lease by issuing the termination notice or seeking to obtain possession of the leased premises.
o Though the pandemic forced High Street to stop providing indoor dining services from mid-March to late-June 2020, High Street was not entitled to use the second half of its lease payment for March 2020 to pay for the grease trap clean-up, either under the doctrine of temporary frustration of purpose or under the “Casualty and Taking” section of the Lease.
o Since High Street did not pay what it owes under the Lease, it is liable for violating the express terms of the Lease, though not for breaching the implied covenant of good faith and fair dealing.
o And since the Lease was terminated due to High Street’s material breach, KNH is entitled (at its option) to a return of the liquor license or to an additional payment of $300,000.
o Greenberg guaranteed payment of and therefore is personally liable for amounts that High Street owes under the Lease, though he is not liable for breaching the guaranty’s implied covenant of good faith and fair dealing. The Court cannot determine on the current record whether Greenberg’s liability is limited to amounts that High Street owed through the date that it vacated the premises, or whether he is also liable for accelerated rent due for the period after High Street relinquished possession.
o KNH’s conduct in notifying High Street’s lender about the Lease termination notice did not violate the Landlord Agreement between

-2-

KNH and BankNewport, and also did not constitute unlawful interference with advantageous relations.
o KNH did not engage in unfair or deceptive trade practices in violation of G.L. c. 93A by terminating the Lease or by informing BankNewport of the termination.
o Even if High Street and Greenberg engaged in unfair trade practices by trying to pressure KNH into modifying the Lease, they did not cause KNH to suffer any separate or distinct injury and therefore cannot be held liable under c. 93A.
o Greenberg is not liable for abuse of process. Though Greenberg caused High Street to bring suit in an attempt to avoid any further obligations under its Lease and to retain possession of the leased premises, that was not an ulterior or illegitimate purpose. To the contrary, it was the express and permissible purpose of High Street’s claims that KNH had violated the Lease by issuing the termination notice and seeking to evict High Street.
What remains to be determined is the total amount of damages that High Street and Greenberg must each pay to KNH, as well as whether KNH will opt to compel return of the liquor license or payment of an additional $300,000. The Court will schedule a final pre-trial conference to set a date for trial of the remaining issues.
1. Termination of High Street’s Lease. KNH is entitled to summary judgment in its favor as to the validity of its notice terminating the Lease, High Street’s and Greenberg’s liability for payments due under the Lease, and KNH’s right to reclaim the liquor license.
1.1. Termination Based on Pre-Pandemic Default. KNH was entitled to terminate the Lease because High Street had violated its contractual obligation to pay costs to clean up a major grease trap discharge. This obligation was incurred well before the pandemic struck in March 2020. High Street is liable under article XIII of the Lease for past and future rent and other payments due under the Lease, in an amount that will have to be determined at trial, if it is not agreed to by the parties.[1]

--------------------------------------------

[1] KNH’s claim against High Street for breach of the implied covenant of good faith and fair dealing adds nothing to its successful claim that High Street has
<continued…>

-3-

1.1.1. Liability for Grease Trap Cleanup. The Lease required High Street to install, clean, and maintain grease traps, and made it responsible for all costs incurred to cleanup any overflow or discharge of grease or to repair any property damage caused by the grease overflow or discharge.[2]
When High Street first took occupancy, the leased premises were served by a metal grease trap located in the building’s mechanical room. High Street understood that it was responsible for maintaining this grease trap. High Street’s general manager arranged for the old grease trap to be replaced with a new system, in the same location, at High Street’s expense.
Unfortunately, the new system was not properly maintained. As of early June 2019 the air vent had become clogged with solids, creating back pressure that cause the top of the grease trap to blow off and the plastic barrels to burst and flood the area with greasy water. As a result, KNH had to hire contractors first to clean the entire boiler room, and then to clean up grease that had also flowed into the building’s sewer ejector room. From June 2019 to February 2020, KNH incurred costs totaling $21,265.73 to clean up the mess caused by the failure of High Street’s grease trap system.[3]

--------------------------------------------

breached the express terms of the Lease. This implied covenant claim is expressly limited to seeking payment of sums due under the Lease. Since KNH has shown that High Street is obligated to pay those amounts under the express Lease terms, and nothing in the record supports a finding that High Street committed “any separate and distinct breach of [the] implied covenant,” the Court concludes that High Street is entitled to summary judgment in its favor on the claim that it violated the implied covenant. See DiFlorio v. DePiero, 1999 WL 1204019, at *7 (Mass. Super. Ct. Sept. 28, 1999) (Sossman, J.).
[2]  The Lease required High Street to install and maintain grease traps, to clean   the grease trap and pipes regularly in order to prevent clogging of or discharge from the trap, and to “do whatever is necessary in order to maintain properly the grease trap and prevent, at all times, any overflow or discharge of grease at the surface of the grease trap manhole or other access point.” Lease § 17.09(b). It also provided that, if there was an overflow or discharge from the grease trap that was not caused by KNH or other tenants in the building, then High Street would be “responsible for all costs of cleanup of the overflow or discharge, including all costs of removing grease, and repair, restoration or replacement of property damaged by such overflow or discharged.” Id. The Lease did not give High Street any right to arrange and pay for the cleanup on its own.
[3] In the statement of material facts, High Street objected to the supporting invoices on the ground that they were hearsay.  That is incorrect. The invoices
<continued…>

-4-

KNH sent timely notices asking High Street to pay the clean-up costs incurred due to the failure of High Street’s grease trap. High Street never did.
High Street insists that its failure to maintain the grease trap is KNH’s problem, and that High Street has no obligation to reimburse KNH’s clean-up costs, because the Lease only required High Street to “install and maintain grease traps in the Premises” (see Lease § 17.09(b), emphasis added) and this grease trap was located outside the space leased to High Street.
As discussed above, however, the summary judgment record establishes that High Street and KNH understood at all times that High Street’s restaurant was using a grease trap system located in the building’s mechanical room, and not inside of the premises leased to High Street. The record also establishes that at all times High Street treated this grease trap as the one that, under the Lease, it was responsible for maintaining. That is why High Street paid to replace the old metal grease trap with a new system, even though High Street knew it was installing the new system in the same location outside of its leased premises.
That the parties treated the nearby grease trap as being High Street’s responsibility, and that High Street paid to replace the old metal grease trap with a new grease trap system in the same location outside of the premises that were leased to High Street, shows two things.
First, it shows that the reference in the Lease to grease traps “in the Premises” was ambiguous. When interpreting a contract, including to determine whether it is ambiguous, a court may consider not only the words used in the contract but also the surrounding circumstances.  “A  lease is to   be read in the light  of

--------------------------------------------

were offered to prove what expenses KNH incurred, not to prove that any statements in the invoices are true. The rule against hearsay only bars admission of out-of-court statements that are offered to prove that the statement was true. See, e.g., Commonwealth v. Mendes, 463 Mass. 353, 367–368 (2012). “If a statement is offered for any purpose other than for its truth, it is not hearsay.” Commonwealth v. Keown, 478 Mass. 232, 245 (2017).
In any case, High Street never moved to strike those documents, they therefore remain part of the summary judgment record, and the Court may and (in the exercise of its discretion) does consider them in deciding the cross-motions for summary judgment. See Brunson v. Wall, 405 Mass. 446, 448 n.4 (1989); see also Madsen v. Erwin, 395 Mass. 715, 721 (1985) (where party does not move to strike hearsay from summary judgment affidavit, court may consider it); Stepan Chemical Co. v. Town of Wilmington, 8 Mass. App. Ct. 880, 881 (1979) (where party does not move to strike documentary evidence from summary judgment record, court may consider it).

-5-

the circumstances of its execution, which may enable the court to see that its words are really ambiguous.” Robert Industries, Inc. v. Spence, 362 Mass. 751, 753 (1973); accord Levin v. Century Indem. Co., 279 Mass. 256, 258 (1932) (“when the meaning of [a contract] ... becomes doubtful in its application to the particular transaction,” extrinsic evidence is admissible “to explain the significance of terms used or to show the relations and methods of the parties in the light of which their written words are to be interpreted”). “[T]he language of a contract need not be ambiguous on its face in order that extrinsic evidence may be admitted.” Keating v. Stadium Mgmt. Corp., 24 Mass. App. Ct. 246, 249–250, rev. denied 400 Mass. 1104 (1987).
Second, this pattern of conduct shows that Lease must be construed as making High Street responsible for all grease traps “for the Premises,” even if they were located outside the space rented to High Street. When interpreting a contract, “conduct of the parties” after they signed their agreement “is … indicative of their intent.” Brigade Leveraged Capital Structures Fund Ltd. v. PIMCO Income Strategy Fund, 466 Mass. 368, 378 (2013), quoting Massachusetts Municipal Wholesale Elec. Co. v. Danvers, 411 Mass. 39, 59 (1991); accord, e.g., Plunkett v. First Fed’l Sav. And Loan Ass’n of Boston, 18 Mass. App. Ct. 294, 302 (1984). “There is no surer way to find out what parties meant, than to see what they have done.” Brigade, supra, quoting Brooklyn Life Ins. Co.  of New  York  v.  Dutcher,  95 U.S. 269, 273 (1877); accord, e.g., Martino v. First Nat. Bank of Boston, 361 Mass. 325, 332 (1972).
1.1.2. Cleanup Costs Were Not Offset by Later Rent. The termination notice that KNH issued to High Street was valid. It was preceded by a written notice of default that was issued on June 16, 2020. The default notice asserted that High Street had failed to pay various amounts that it owed under the Lease, including the $21,265.73 for grease trap clean-up costs. The Lease provided in article XIII that, if High Street did not pay this amount within ten days of the default notice, then KNH “lawfully may immediately terminate this Lease.”
It is undisputed that after the default notice High Street made no further payments to KNH. And High Street conceded, in the consolidated statement of material facts in support of KNH’s motion for partial summary judgment, that it is “undisputed that 10 High Street did not pay the grease trap charges.”
Therefore, the termination notice that KNH issued on July 30, 2020, was valid and enforceable, and KNH lawfully terminated the Lease because High Street was in default.

-6-

High Street now argues that it was entitled to credit part of its rent payment for March 2020 against the amount it owed in connection with the grease trap failure, because indoor restaurant dining was suspended for three months due to the COVID-19 pandemic. High Street paid $44,957.96 in advance for the March 2020 rent. But then, by orders of Governor Baker, High Street could not serve food or drinks indoors from March 17 to June 22, 2020.
High Street contends that this constituted a temporary frustration of purpose, and that as a result its obligation to pay rent was suspended during this period. See Le Fort Enterp., Inc. v. Lantern 18, LLC, 491 Mass. 144, 161 (2023); Inland Commercial R.E. Svcs., LLC v. ASA EWC, LLC, 102 Mass. App. Ct. 796, 800–801, rev. denied, 493 Mass. 1102 (2023).[4] High Street also contends that due to the Governor’s orders it is entitled to a partial abatement of its rent under the “casualty and taking” section of the Lease.
High Street says that it was therefore entitled to a rent credit totaling $21,753.90 for the period from March 17 to March 31, 2020,[5] and that this credit more than covered the amount that it owed for the cost of the grease trap clean-up.
Although the summary judgment record establishes that the Governor’s emergency orders temporarily frustrated the purpose of the Lease, and that as a result High Street’s obligation to continue making monthly rent payments was temporarily suspended, High Street’s argument still fails because it was not entitled to a partial refund of rent that it had already paid. Nor was High Street entitled to a partial rent credit under the “casualty and taking” clause, because the Governor’s orders did not destroy or damage the leased premises.
1.1.2.1. The Principal Purpose of the Lease Was Temporarily Frustrated. The premise of High Street’s argument, that the Governor’s closure orders resulted in a temporary frustration of the purpose of the Lease, is correct.

--------------------------------------------

[4] High Street does not contend, and nothing in the summary judgment record suggests, that the temporary frustration of the purpose of its Lease from late March to late June 2020 resulted in a permanent discharge of its duty to perform. That High Street had to close its restaurant for three months, at the start of the seventh year of a fifteen-year lease period, did not substantially frustrate the principal purpose of the entire Lease and thus did not excuse High Street entirely from further performance under the Lease. See Inland Commercial, 102 Mass. App. Ct. at 799–800.
[5] The period from March 17 to March 31 is a total of fifteen days. And $44,957.96 * 15/31 = $21,753.90.

-7-

Under the frustration of purpose doctrine, a party to a contract may be excused from performing its contractual obligations, or those obligations may temporarily be suspended, “when an event neither anticipated nor caused by either party, the risk of which was not allocated by the contract, destroys the object or purpose of the contract, thus destroying the value of performance.” Chase Precast Corp. v. John J. Paonessa Co., Inc., 409 Mass. 371, 374 (1991).
KNH argues that there was no frustration of purpose because High Street could have continued providing take out service, or used the kitchen in the leased premises to provide outdoor dining in nearby space that High Street had procured, or both. The “permitted use” provision of the Lease authorized High Street to use the leased premises “for the purpose of a first-class, upscale table service restaurant, lounge, bar, and/or event space” and for “all uses ancillary thereto.” Take out service and outdoor dining were permitted ancillary uses.
But the frustration of purpose doctrine may apply in the context of a lease even where the tenant could use the premises in some way that would not fulfill the principal purpose of the lease. Frustration of purpose does not require that it becomes completely impossible to make any use of the leased premises. This is clear from the history of this doctrine.
“The leading case on frustration remains Krell v. Henry, [1903], 2 K.B. 740 (A.C.). Krell rented Henry a suite of rooms” in London, England, “for watching the coronation of Edward VII, but Edward came down with appendicitis and the coronation had to be postponed.” Northern Indiana Public Service Co. v. Carbon County Coal Co., 799 F.2d 265, 277 (7th Cir. 1986). Henry had agreed to let the rooms for two days “at a steep cost” but, when the coronation was temporarily cancelled, he refused to pay. Le Fort, 491 Mass. at 161; accord Krell, supra. After Krell brought suit, Henry “argued that his principal purpose in entering the rental contract – namely, to gain access to a vantage point from which to watch the coronation – was ‘frustrated’ when the procession was canceled; accordingly, he maintained that he should be refunded his deposit and excused from paying the balance of the rent.” Id., citing Krell 2 K.B. at 740, 745. Henry prevailed. Though he could have used the rooms for some other purpose, Henry’s contractual obligation was discharged because “the object of the contract was frustrated by the non-happening of the coronation and its procession on the days proclaimed.” Krell, supra, at 754.
As Krell demonstrates, so long as a party’s “principal purpose” in making the contract “is substantially frustrated,” further performance under the contract may be excused or suspended. Le Fort, 491 Mass. at 160, quoting Chase Precast,

-8-

409 Mass. at 375. In other words, frustration of purpose occurs “where an unanticipated event entirely or substantially destroys the overall purpose of the contract.” Inland Commercial, 102 Mass. App. Ct. at 800. “The purpose relevant to the analysis is the ‘party’s principal purpose as understood by both parties at the time the contract is made.’ ” Le Fort, supra, quoting T. Murray, Corbin on Contracts: Force Majeure and Impossibility of Performance Resulting from COVID-19, § 5.01[4] (2021).
The “permitted use” provision of the Lease establishes that KNH and High Street both understood that the principal purpose of the Lease was to operate a “table service restaurant.” And the summary judgment record establishes that this principal purpose was substantially frustrated for several months by the Governor’s orders. That “ancillary uses” allowed under the Lease were still permitted has no bearing on whether the “principal purpose” of the Lease was temporarily frustrated.
1.1.2.2. No Partial Refund for Temporary Frustration. During the period of temporary frustration, High Street’s obligation to keep paying rent each month was temporarily suspended. See Le Fort and Inland Commercial, supra. So High Street did not have to pay the rent for April, May, and through June 22, 2020 (that date that the Governor allowed restaurants in Massachusetts to restart indoor dining) when it came due, on the schedule required by the Lease.
But once Massachusetts restaurants were allowed to reopen in late June 2020, High Street was obligated to pay all of the rent that had been accruing during the temporary closure period. A temporary frustration of purpose “will suspend, rather than discharge, a duty to perform unless the party’s ‘performance after the cessation of the … frustration would be materially more burdensome than had there been no … frustration.” Le Fort, 491 Mass. at 161, quoting Restatement (Second) of Contracts § 269 (1981); accord Inland Commercial, 102 Mass. App. Ct. at 800–801. “When the circumstances giving rise to the … frustration cease to exist, [the affected party] must then perform. He is usually expected to perform in full and is entitled to an appropriate extension of time for performance.” Restatement § 269, comment a.
Neither Le Fort nor Inland Commercial holds or suggests that, where a tenant has paid monthly rent in advance, a temporary frustration of purpose in the middle of a month for which rent has been paid will give the tenant a legal right to obtain a proportionate refund of its rent for the period of temporary frustration. Suspension of future contractual obligations, pursuant to Le Fort and Inland Commercial, is not the same thing as obtaining a refund of past rent payments.

-9-

High Street’s obligation to pay rent was “merely suspended, not discharged,” during the three months that the Governor’s order temporarily frustrated the principal purpose of the Lease. See Inland Commercial, 102 Mass. App. Ct. at 801.
Since the rent obligation was not discharged, High Street had no right to obtain a partial refund of its rent payment for March 2020, or to demand that part of that payment be credited against the grease-trap cleanup costs.
1.1.2.3. No Partial Credit under the Casualty and Taking Clause. High Street also argues that the Governor’s orders temporarily barring restaurants from opening implicated the “casualty and taking” provision in the Lease, and that this is an independent reason why High Street is entitled to credit its rent payment for the last 15 days of March 2020 against its obligation to pay the grease trap clean-up costs. This argument is also without merit.
In relevant part, the casualty and taking section states that if any substantial part of the leased premises is “materially destroyed or damaged,” whether “by fire or unavoidable casualty or action of any public or other authority,” then KNH could terminate the Lease. It further provides that if KNH opts not to terminate the Lease, and the “destruction or damage render[s] the Premises unfit for use and occupation,” then High Street would be entitled to an abatement of rent from the time of the destruction or damage until thirty days after the Premises “have been put in proper condition for use and occupation.”[6]
Although the Governor’s pandemic-related closure orders were obviously an action of a public authority that prevented High Street from using the leased premises as intended, that is not enough to trigger the casualty and taking provision. Government action will trigger the relevant part of this Lease provision only if it “materially destroy[s] or damage[s]” a “substantial part” of the leased premises. And High Street will be entitled to an abatement of rent only if the Premises are “unfit for use and occupation” because of “destruction or damage” caused by the government action.
The Governor’s orders did not trigger the casualty and taking clause because they did not destroy or physically damage any part of the leased premises. See Verveine Corp. v. Strathmore Ins. Co., 489 Mass. 534, 542–543 (2022) (Governor’s

--------------------------------------------

[6] The provision would also be triggered if the Premises or building in which it is located is “taken by any exercise of the right of eminent domain.” High Street clarified in its opposition to KNH’s motion for partial summary judgment (at page 9) that it does not contend that Governor Baker’s orders constitute a taking of property by eminent domain.

-10-

orders did not trigger restaurants’ business interruption insurance coverage because the orders did not cause “direct physical loss of or damage to” the premises); Critzos v. Marquis, 287 A.3d 1281, 1290–1291 (Md. App. Ct. 2023) (Governor’s COVID-19-related orders prohibiting in-person dining did not implicate lease provision addressing destruction of premises by fire or other casualty); Gap, Inc. v. 170 Broadway Retail Owner, LLC, 195 A.D.3d 575, 577, 151 N.Y.S.2d 37, 40 (N.Y. App. Div. 2021) (same).
1.2. Greenberg’s Personal Liability. Seth Greenberg personally guaranteed payment of any and all amounts owed by High Street under the Lease. The Guaranty signed by Greenberg provides that it is “primary, direct[,] and immediate,” and that KNH may recover against Greenberg for a breach of the Lease without having to first exhaust its remedies against High Street.
KNH is entitled to summary judgment in its favor as to Greenberg’s liability under the Guaranty.[7] Greenberg is jointly and severally liable for at least part of the money that High Street owes to KNH under the Lease.
The Court cannot tell from the summary judgment record whether Greenberg’s personal liability is limited to payments owed by High Street for the period before it vacated the leased premises. The Guaranty provided in § 1(a) that Greenberg was personally liable for payments owed by High Street up through the “Vacate Date,” a defined term. Section 13.A says that if High Street had delivered an irrevocable written notice that specified the date High Street would irrevocably deliver possession of the leased premises to KNH, that would be the Vacate Date. So, if High Street provided and then complied with such a notice, Greenberg’s personal liability would be limited. But if High Street did not do so, then there was no “Vacate Date” and Greenberg would be

--------------------------------------------

[7] KNH’s claim against Greenberg for breach of the implied covenant of good  faith and fair dealing adds nothing to its successful claim that Greenberg is liable under the express terms of the Guaranty. This implied covenant claim is expressly limited to seeking payment of sums due under the Guaranty. Since KNH has shown that Greenberg is liable under the express terms of the Guaranty, and nothing in the summary judgment record supports a finding that Greenberg committed “any separate and distinct breach of [the] implied covenant,” the Court concludes that Greenberg is entitled to summary judgment in its favor on the claim that it violated the implied covenant. See DiFlorio v. DePiero, 1999 WL 1204019, at *7 (Mass. Super. Ct. Sept. 28, 1999) (Sossman, J.)

-11-

personally liable for all sums owed by High Street under the Lease. This issue will have to be resolved by the parties or at trial.
1.3. The Liquor License. For the reasons discussed above, the summary judgment record establishes that the Lease was validly terminated by KNH due to an “Event of Default,” as that term is defined in article XIII of the Lease.
It follows that, under the plain language of § 17.10(g) of the Lease, KNH may opt to have the Liquor License identified in the Lease transferred from High Street to KNH or its nominee, in which case High Street will be contractually obligated to cooperate in the transfer process. Alternatively, if KNH gives notice that it does not wish to have the Liquor License transferred, then High Street’s $300,000 promissory note “shall become immediately due and payable.” This liability is an addition to the other amounts that High Street owes under the Lease.
Since KNH terminated the Lease as a result of an Event of Default, it was not required under the Lease to choose between these two options within 30 days after the Lease was terminated.
The summary judgment record establishes that KNH is entitled, as requested in its counterclaims, to declarations that (I) KNH terminated the Lease as a result of an “Event of Default,” (ii) if requested to do so by KNH, then High Street will have a contractual obligation to cooperate reasonably and in good faith for the purpose of effectuating the transfer of the Liquor License to KNH or its nominee, and (iii) if KNH provides notice that it does not want to have the Liquor License transferred, then High Street’s $300,000 promissory note shall immediately be due and payable.
2. KNH’s Notice to BankNewport. When KNH and High Street executed the Lease, KNH also entered into a contract with High Street’s lending bank, BankNewport. This Landlord Agreement was necessary because High Street had secured a loan from BankNewport by granting a security interest in personal property that High Street was going to install in the leased premises.
KNH agreed in the Landlord Agreement that any interest or claim it may have in or against High Street’s personal property in the leased premises would be subordinate to BankNewport’s security interest, and thus also subordinate to any right BankNewport may have to take possession of or to liquidate this personal property. KNH promised (in § 2.2) that it would give BankNewport notice if it had the right to and desired to obtain possession of the leased

-12-

premises, and separately promised (in § 2.4) that it would give BankNewport written notice of any material default by High Street under the Lease.
On July 31, 2020, Mr. Greenberg emailed to BankNewport a copy of the lease termination notice that KNH had issued the day before. BankNewport immediately responded by freezing High Street’s account with the bank. The bank ultimately seized the funds in this account because High Street failed to cure its default under its loan agreement with BankNewport.
KNH had also sent a copy of its termination notice to BankNewport, by overnight mail. BankNewport received the termination notice copy sent by KNH later on July 31, 2020, after it had already frozen High Street’s account.
High Street’s claim that KNH breached the Landlord Agreement by informing BankNewport that High Street had committed a material breach of its lease fails as a matter of law. High Street argues that KNH was allowed to provide notice to BankNewport only if KNH had the right and the intention to take possession, and that as of July 31, 2020, KNH had no right to possession because the Governor had issued an executive order staying evictions. This argument overlooks KNH’s independent obligation to notify BankNewport if High Street materially breached its obligations under the Lease. For the reasons discussed above, KNH correctly informed the bank that High Street had defaulted by committing a material breach. KNH was therefore acting as required under the Landlord Agreement when it sent a copy of the termination notice to BankNewport. It did not breach that contract.
High Street’s further claim that KNH tortiously interfered with the business relationship between High Street and BankNewport also fails as a matter of law. To prove this claim, High Street must show that (I) it had an advantageous relationship with the bank, (ii) KNH “knowingly induced” BankNewport to break off its relationship with High Street, (iii) the interference, “in addition to being intentional, was improper in motive or means,” and (iv) High Street suffered harm as a result. Blackstone v. Cashman, 448 Mass. 255, 260 (2007).
This claim fails because there is no evidence that KNH had an improper motive or used improper means when it informed BankNewport about High Street’s material breach of the lease. As discussed above, the lease termination notice was proper and valid, because High Street was in default. And notifying BankNewport about the termination notice could not be improper, because KNH had a contractual obligation to do exactly that. An intent to comply with

-13-

the terms of the Landlord Agreement is not an improper motive, and doing so as required by that contract is not improper means.
Both of these claims, for breach of contract and intentional interference, also fail for an additional reason. Causation of harm or injury is an element of a claim for breach of contract or for intentional interference with advantageous relations. See, e.g., Bulwer v. Mount Auburn Hosp., 473 Mass. 672, 690 (2016) (breach of contract); Blackstone, supra (tortious interference). As discussed above, however, BankNewport knew of High Street’s default and the termination notice, and took steps to freeze High Street’s bank account, before it ever received the copy of the notice from KNH. The summary judgment record therefore establishes that KNH’s act in sending a copy of the termination notice to BankNewport did not cause High Street any harm or injury.
3. Claims under Chapter 93A. The claims that KNH, High Street, and Greenberg all engaged in unfair or deceptive conduct that violated G.L. c. 93A fail as a matter of law.
3.1. High Street’s 93A Claim against KNH. High Street contends that KNH committed unfair trade practices in violation of c. 93A by sending a notice purporting to terminate the Lease even though High Street was not in default, and then by wrongfully notifying BankNewport about the termination notice.
This claim fails for the reasons discussed above. The termination notice to High Street was proper—and therefore could not constitute an unfair trade practice—because High Street had committed a material breach of the Lease, as discussed above in §§ 1.1 through 1.1.2.3 of this decision. And KNH’s conduct in forwarding the termination notice to the bank was proper because it was required by the Landlord Agreement, as discussed in § 2 above.
Since High Street’s claim under c. 93A is wholly derivative of its contract and tort claims, and those underlying claims fails as a matter of law, the c. 93A claim fails as well. See Park Drive Towing, Inc. v. City of Revere, 442 Mass. 80, 85–86 (2004) (where c. 93A claim is based on and derivative of some underlying claim that fails as a matter of law, that 93A claim “must also fail”); Macoviak v. Chase Home Mortgage Corp., 40 Mass. App. Ct. 755, 760, rev. denied, 423 Mass. 1109 (1996) ©. 93A claim “necessarily fail[s]” where it “is solely based upon … underlying claim for common law” tort and that tort claim fails as a matter of law); Frohberg v. Merrimack Mut. Fire Ins. Co., 34 Mass. App. Ct 462, 465 (1993) ©. 93A claim properly dismissed where it is based solely on “legally unsupportable” claim for breach of contract).

-14-

High Street cannot press its c. 93A claim on the alternative theory that KNH violated the Governor’s eviction moratorium, because nothing in the summary judgment record would support a finding that KNH did anything that violated those emergency orders.
3.2. KNH’s 93A Claims against High Street and Greenberg. KNH asserts its own claims under G.L. c. 93A. It contends that High Street and Greenberg committed unfair trade practices by refusing to reopen High Street’s Serafina restaurant, and refusing to have High Street make payments required under the Lease, unless KNH agreed to substantially reduce its rent charges. Though a reasonable factfinder might decide that this conduct by High Street and Greenberg constituted an unfair trade practice, the c. 93A claims by KNH nonetheless fail as a matter of law because there is no evidence that KNH suffered any harm or injury that was separate and distinct from High Street’s breach of its lease obligations.
High Street and Greenberg are therefore entitled to partial summary judgment in their favor on KNH’s claims under c. 93A, even though they did not seek summary judgment on those claims. See Mass. R. Civ. P. 56(c) (“Summary judgment, when appropriate, may be rendered against the moving party.”); Targus Group Intern., Inc. v. Sherman, 76 Mass. App. Ct. 421, 422 n.2 & 428-434 (2010) (affirming summary judgment in favor of non-moving plaintiff on breach of contract claim based on court’s interpretation of written agreement); Petrillo v. Zoning Bd. of Appeals of Cohasset, 65 Mass. App. Ct. 453, 460–461 (2006) (affirming sua sponte grant of summary judgment for non-moving party).
The Court recognizes that “commercial extortion,” undertaken “by one business to ‘extract undeserved concessions from other business entities,’ ” is an unfair trade practice that violates c. 93A. H1 Lincoln, Inc. v. South Washington Street, LLC, 489 Mass. 1, 15 (2022), quoting Anthony’s Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 474 (1991) (“commercial extortion”), and Renovator’s Supply, Inc. v. Sovereign Bank, 72 Mass. App. Ct. 419, 430 (2008) (“extract undeserved concessions…”).
But KNH cannot prevail on its c. 93A claims because there is no evidence that it suffered any harm or injury, separate and apart from Hill Street’s failure to pay what it owed under the Lease, because of the alleged attempts by High Street and Greenberg to pressure KNH into making lease concessions.
Proof of legally cognizable harm or injury is a necessary element of any claim under G.L. c. 93A. See Bellermann v. Fitchburg Gas & Elec. Light Co., 475 Mass.

-15-

67, 73 (2016) (“Bellermann II”); Tyler v. Michaels Stores, Inc., 464 Mass. 492, 501– 503 (2013). There can be no liability under c. 93A if the allegedly unfair or deceptive act or practice did not cause some compensable injury. See, e.g., Hershenow v. Enterprise Rent-A-Car Co. of Boston, Inc., 445 Mass. 790, 801 (2006) (claim under c. 93A, § 9); Butts v. Freedman, 96 Mass. App. Ct. 827, 831–832 (2020) (claim under § 11).
“[T]o meet the injury requirement under G.L. c. 93A, § 9(1) or 11, a plaintiff must have suffered a ‘separate, identifiable harm arising from the [regulatory] violation’ that is distinct ‘from the claimed unfair or deceptive conduct itself.’ ” Bellermann II, supra, quoting Tyler, supra, at 503. A business or consumer is not entitled to collect even nominal damages under c. 93A without proving that the violation caused some sort of “separate” and “distinct” injury. Tyler, supra; Karaa v. Kuk Yim, 86 Mass. App. Ct. 714, 725 (2014).
In enacting c. 93A, “the Legislature … did not intend to confer on plaintiffs who have suffered no harm the right to receive a nominal damage award which will in turn entitle them to a sometimes significant attorney’s fee recovery.” Aspinall v. Philip Morris Cos. Inc., 442 Mass. 381, 401 (2004), quoting Lord v. Commercial Union Ins. Co., 60 Mass. App. Ct. 309, 321–322 (2004); accord Butts, 96 Mass. App. Ct. at 832 (plaintiff suing under c. 93A, § 11, not entitled to attorneys’ fees merely for identifying unfair or deceptive conduct that caused no harm or loss).
KNH has mustered no evidence that it suffered a separate and distinct injury because of High Street’s failure to pay what it owed under the Lease. High Street and Greenberg are therefore entitled to summary judgment in their favor on these claims. See generally Roman v. Trustees of Tufts College, 461 Mass. 707, 711 (2012) (“A nonmoving party’s failure to establish an essential element of her claim ‘renders all other facts immaterial’ and mandates summary judgment in favor of the moving party.”) (quoting Kourouvacilis v. General Motors Corp., 410 Mass. 706, 711 (1991)).
4. Abuse of Process Claim. Greenberg is also entitled to summary judgment in his favor on KNH’s claim against him for abuse of process, even though (once again) Greenberg did not seek summary judgment on this claim.[8]

--------------------------------------------

[8]  Greenberg asserts in passing that the claim for abuse of process is barred by   the so-called anti-SLAPP statute, G.L. c. 231, § 59H. In the exercise of its discretion, the Court declines to address the point because Greenberg has raised it far too late and never moved to dismiss this claim under § 59H.
<continued…>

-16-

The elements of a claim for abuse of process are “that the process was used to accomplish some ulterior purpose for which it was not designed or intended, or which was not the legitimate purpose of the particular process employed,” and that the plaintiff was harmed as a result. Ladd v. Polidoro, 424 Mass. 196, 198 (1997), quoting Gabriel v. Borowy, 324 Mass. 231, 236 (1949). “[A]t its essence, abuse of process is a ‘form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money.’ ” 477 Harrison Ave., LLC v. JACE Boston, LLC, 483 Mass. 514, 527 (2019), quoting Fabre v. Walton, 436 Mass. 517, 519 n.3 (2002).
KNH contends that Greenberg caused High Street to sue KNH in an attempt to avoid High Street’s obligations under the Lease, and thus avoid Greenberg’s personal obligations under his Guaranty, and also try to prevent KNH from regaining legal possession of the leased premises.
But those are neither ulterior nor illegitimate purposes. In its complaint, High Street expressly alleged and claimed that it had not breached the Lease and that KNH had acted unlawfully in allegedly compelling High Street to surrender possession of the leased premises. That was the explicit purpose of High Street’s lawsuit, not some hidden, ulterior purpose.
Nor is there anything “illegitimate” or improper about High Street taking the position that it had not breached the Lease. KNH’s insistence that High Street knew or should have known that its claims would not prevail is not enough to support its claim for abuse of process. The “mere commencement of litigation to enforce a claim which the person commencing the litigation knows or reasonably should have known to be groundless” does not support a claim for abuse of process unless the plaintiff also proves that the lawsuit was brought “for an ulterior purpose by the party using the process” that commenced the action. Beecy v. Pucciarelli, 387 Mass. 589, 596 (1982); accord Psy-Ed Corp. v. Klein, 459 Mass. 697, 713–714 (2011); Ladd, 424 Mass. at 199–200.

--------------------------------------------

A special motion to dismiss may be filed as of right under the anti-SLAPP statute within 60 days of the service of the challenged claims. See § 59H. A court has discretion to allow such a motion to be filed “at any later time upon terms it deems proper,” but is not required to do so. Id. Thus, “[t]he anti-SLAPP statute contemplates that, ordinarily, a special motion to dismiss is to be brought within sixty days of the service of the complaint[.]” Burley v. Comets Cmty. Youth Ctr., Inc., 75 Mass. App. Ct. 818, 822 (2009). Greenberg has no right to assert an anti-SLAPP defense in opposing a motion for summary judgment years after KNH filed its action against Greenberg.

-17-

ORDERS
The motion by 10 High Street Restaurant, LLC, (“High Street”) for partial summary judgment on its claims against the KNH Realty Trust (“KNH”) for breach of the express terms of the lease that High Street entered into with KNH, and for breach of the landlord agreement that KNH entered into with BankNewport, is denied.
The motion by KNH for partial summary judgment as to liability on all claims and counterclaims in these consolidated actions is allowed in part with respect to: (I) all of High Street’s claims against KNH; (ii) KNH’s counterclaims against High Street for breach of the express terms of the Lease and for declaratory judgment with respect to the liquor license discussed in the Lease; and (iii) KNH’s claim against Seth Greenberg under the express terms of his personal guaranty. This motion is denied in part with respect to KNH’s counterclaims against High Street and Mr. Greenberg for breach of implied covenants and fair dealing and for allegedly violating of G.L. c. 93A, and with respect to KNH’s claim against Greenberg for abuse of process.
High Street is entitled to and is hereby granted summary judgment in its favor on KNH’s counterclaims for breach of the implied covenant of good faith and fair dealing in the Lease and for allegedly violating G.L. c. 93A. Greenberg is entitled to and is hereby granted summary judgment in his favor on KNH’s claims for breach of the implied covenant of good faith and fair dealing in his personal Guaranty, abuse of process, and for allegedly violating G.L. c. 93A.
When final judgment enters in this case, it will include declarations that:
(I) KNH Realty Trust terminated its Lease with 10 High Street Restaurant, LLC, as a result of an “Event of Default,” as that term is defined in the Lease (ii) if requested to do so by KNH, then High Street will have a contractual obligation to cooperate reasonably and in good faith for the purpose of effectuating the transfer of the Liquor License to KNH or its nominee, and (iii) if KNH provides notice that it does not want to have the Liquor License transferred, then High Street’s $300,000 promissory note shall immediately be due and payable.
A final pre-trial conference will be held in person on July 11, 2024, to discuss the scheduling of a trial on all remaining issues. The parties shall file their joint pretrial memorandum by June 28, 2024.